IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| United States of America ex rel. | ) | |
| Marquis Thomas (K76240), | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| vs. | ) | |
| | ) | Case No. 23-cv-50019 |
| | ) | |
| BRITTANY GREENE, Warden, | ) | |
| WESTERN ILLINOIS CORRECTIONAL | ) | |
| CENTER | ) | |
| | ) | |
| Respondent. | ) | |

## MEMORANDUM IN SUPPORT OF AMENDED PETITION FOR WRIT OF HABEAS CORPUS UNDER 28 U.S.C. § 2254

On the evening of April 3, 2007, a man wearing a black hoodie fatally shot Lavontaye Nunn in the courtyard of Blackhawk Housing Apartments ("Blackhawk") on the 1500 block of Birch Court in Rockford, Illinois. Marquis Thomas was charged with first-degree murder one month later, based on eyewitness accounts of the shooting. From the time he was arrested nearly sixteen years ago until today, Mr. Thomas has steadfastly maintained his innocence.

Mr. Thomas' innocence was apparent well before trial. Another individual, Nathaniel Marcus Howell, confessed to both the police and a juvenile detention center chaplain that he, not Mr. Thomas, killed Nunn. Howell's first confession was to Chaplain Wayne Fricks, a juvenile chaplain at the Winnebago County Juvenile Detention Center, in early May of 2007. During a one-on-one counseling session with

1

Fricks, Howell — incarcerated on unrelated charges — confessed to Nunn's murder. Fricks encouraged Howell to confess to the police, which Howell did on May 7, 2007.

Mr. Thomas moved to introduce both of Howell's confessions at his trial. After a partial evidentiary hearing on the admissibility of Howell's confession to Fricks, the trial court excluded the confession on a clear misapplication of Illinois' clergy-penitent privilege. The trial court excluded Howell's confession to the police because it found, without considering the corroborating confession to Fricks, that the police confession did not bear objective indicia of reliability. In total, the court denied at least four separate attempts by Mr. Thomas' trial counsel to introduce these confessions. Furthermore, immediately before trial, the trial court went a step further and granted the State's motion to exclude *any* witness from mentioning *any* statements made by Howell. The State's mission to bury Howell's confessions was successful. Without the ability to tell the jury about Howell's confessions, Mr. Thomas was convicted of murder and sentenced to 55 years in prison.

On appeal, Mr. Thomas' court-appointed appellate counsel inexplicably failed to challenge the exclusion of Howell's confession to Fricks despite the trial court's clear error. Appellate counsel raised as error the exclusion of Howell's confession to the police, but did not even argue that Howell's confession to Fricks corroborated his police confession. Ultimately, because Mr. Thomas' appellate counsel performed deficiently, Mr. Thomas' conviction was upheld.

Following a post-conviction evidentiary hearing at which Mr. Thomas presented six witnesses on appellate counsel's ineffective assistance and on the

admissibility of Howell's statements, Mr. Thomas' conviction was vacated. The Illinois Appellate Court for the Second District reversed, and the Illinois Supreme Court denied leave to appeal.

## I.  STATEMENT OF FACTS

Marquis Thomas was arrested on April 29, 2007, and charged with first-degree murder by personally discharging the firearm that killed Lavontaye Nunn on April 3, 2007. (R. 1215, 1627-28; C. 25-27.)[1] He was convicted after a jury trial, and sentenced to 55 years in the Illinois Department of Corrections. (C. 599-600; R. 1965.) Due to pre-trial rulings by the trial court, Mr. Thomas was barred from introducing any evidence that another individual, Nathaniel Howell, had killed Nunn and had confessed multiple times, including to a chaplain and to police. On direct appeal, Mr. Thomas' appellate counsel chose not to challenge the pre-trial ruling that excluded testimony regarding Howell's confessions to a prison chaplain. Mr. Thomas' direct appeal was denied.

After a third-stage evidentiary hearing on an amended post-conviction petition, the post-conviction court reversed Mr. Thomas' conviction and granted him a new trial, finding that Mr. Thomas' appellate counsel on direct appeal was ineffective. The appellate court overturned.

---

[1] Citations to "R." are citations to the report of proceedings. Citations to "C." are citations to the common law record. Due to the volume of these documents, they were not provided to the court with this memorandum but can be provided immediately upon request.

*Pre-Trial Proceedings*

The pre-trial record reflects that another individual, Nathaniel Howell[2], confessed to murdering Lavontaye Nunn on at least two separate occasions before Mr. Thomas' trial. Mr. Thomas, on the other hand, has consistently denied any involvement in Nunn's murder. Howell's confessions were the subject of two pre-trial motions and hearings.

On June 11, 2008, Mr. Thomas' trial counsel learned—for the first time—that Howell had confessed to the Nunn murder to Rockford Police detectives more than a year earlier, on May 7, 2007. Mr. Thomas' trial counsel promptly filed a motion to "determine the circumstances and admissibility of a May 7, 2007 confession Howell made to Rockford Police detectives." (C. 128-29.) There was no mention of Howell's confession in the materials provided to Mr. Thomas' trial counsel. (R. 114.) The trial court ordered the detectives to create a report detailing Howell's May 7 confession. (R. 126.)

On August 7, 2008, the trial court held a hearing on the admissibility of Howell's May 7, 2007 confession as a statement against his penal interest. Detective Eric Harris ("Detective Harris") testified that he and Detective Posley interviewed Howell on May 7, 2007. (R. 160-61.) That morning, they picked up Howell from the juvenile detention center, where he was being held on unrelated charges, and took him to the Rockford Police station for questioning about the murder of Lavontaye Nunn. (R. 161-63, 165.) When Detectives Harris and Posley and Howell arrived at

---

[2] Nathaniel Howell, referred to as "N.H." at Mr. Thomas' pre-trial hearings, was a minor at the time of the murder. He is now deceased. (R. 2153-54; C. 1556.)

4

the police station, the detectives put Howell in an interview room, read him his Miranda rights, and told him they wanted to question him about the Nunn murder. (R. 163-65.) Howell immediately said, "I did it." (R. 163-65.) According to Detective Harris, there was no question that Howell was referring to Nunn's murder. (R. 166.) The detectives immediately stopped Howell from saying anything further so that they could obtain video recording equipment to record his confession. (R. 164.)

Howell then waited in the interview by himself for more than two hours. (R. 160, 172.) When the detectives finally returned, Howell recanted his confession. (R. 166.) However, Howell admitted he was at the murder scene, consistent with information the police had received from other individuals during the investigation. (R. 166-67.) Howell also said he was wearing a black hoodie, which witnesses had described the shooter wearing. (R. 168-69.) Howell even admitted he touched the murder weapon, in addition to giving the police a motive for the shooting. (R. 166-67.) Nevertheless, the detectives released Howell without arresting him, and after May 7, Howell refused to speak with the police about the murder. (R. 167-68.)

After hearing argument from both sides, the court denied Mr. Thomas' motion stating, "what we have here is simply a statement by [Howell], I did it," and noting that statement "wasn't corroborated by other evidence." (R. 190-91.) At the time of this ruling, no one was aware that Howell had also separately confessed to the Nunn murder to a prison chaplain.

On November 13, 2008, Mr. Thomas' trial counsel filed another motion regarding another confession by Nathaniel Howell to Nunn's murder. This time

Howell had confessed to Chaplain Wayne Fricks, a Pentecostal minister employed by the Rockford Reachout Jail Ministry. (C. 197-98.) Fricks testified at a pre-trial admissibility hearing on Howell's confessions. At the time of Howell's confessions, Fricks was an ordained Pentecostal minister employed by the Rockford Reachout Jail Ministry as a juvenile chaplain where he led a Bible study group and offered individual counseling to inmates at the JDC and the county jail (R. 270-71.) Fricks first met Howell at the JDC in early 2007 when Howell—who was being held on unrelated charges—signed up for individual counseling sessions. (R. 273-74.) Fricks met with Howell "several times" while Howell was incarcerated. (R. 274.)

During one of these counseling sessions, Howell told Fricks that "he had a lot on his heart," and Fricks invited Howell to express himself. (R. 274-75.) Howell told Fricks that he had shot and killed someone in Blackhawk Housing Projects (R. 274-75.) Howell told Fricks that another individual named Blackie had been charged with the crime. (R. 274-75, 278-79.) According to Fricks, Howell's confession was very sincere. (R. 284.) After hearing the confession, Fricks told Howell that he should tell the authorities. (R. 276, 282.)

Shortly after Howell confessed to Fricks, Fricks met with Mr. Thomas. At the time of their first conversation, Fricks did not know of any connection between Mr. Thomas and Nathaniel Howell. Mr. Thomas told Fricks that he did not kill Nunn and that a young man named "Marcus" committed the murder. (R. 287-88.) Fricks did not initially know who Marcus was, but as Mr. Thomas described the circumstances of

Nunn's murder, Fricks realized that Mr. Thomas was referring to Howell, whose middle name is Marcus. (R. 288.)

After speaking with Mr. Thomas, Fricks met with Howell again. (R. 278.) Fricks testified that this conversation occurred about a week after Howell's initial confession to Fricks, and a few days after Howell confessed to detectives. (*Id.*) Howell told Fricks that he had tried to "redeem himself" by telling the police that he had killed Nunn, but the detectives did not believe him. (R. 276, 278, 280, 282, 285.)

While testifying about the circumstances of Howell's confession, Fricks was asked whether the rules of the Pentecostal church enjoined disclosure of admissions made to him. (R. 282.) Fricks responded that nothing in the rules prevented him from disclosing admissions made to him and if he felt like it was necessary to share, he could do so. Fricks reiterated that nothing in the Pentecostal faith prohibited him from sharing with others a statement that was made to him in confidence, and said he was willing to testify concerning Howell's admissions to him. (R. 282-83.)

Before the conclusion of Fricks' testimony, the State asked to continue the hearing due to a scheduling issue. (R. 295.) When the hearing resumed on January 27, 2009, Attorney Michael Raridon appeared on behalf of Howell, asserted clergy-penitent privilege, and moved to prevent any future testimony by Fricks. (R. 342-44.) Because Fricks testified that the rules of his religion did not prevent him from disclosing Howell's confessions, the burden had shifted to Howell to prove that Fricks' testimony about the confession would violate the rules of Fricks' religion. (735 ILCS

§8-803) (R. 342, 344, 352-55.) It is undisputed that Howell's counsel presented no such evidence.

Nonetheless, the court stated, "[r]ight or wrong, I'm ruling," before concluding that Fricks' testimony was excluded based on clergy-penitent privilege because Howell *expected* his conversation with Fricks to be confidential. (R. 370, 372-73.) The court also rejected defense counsel's argument that Howell's prior confession to the police was relevant to the admissibility of Howell's confession to Fricks, stating that Howell's police confession "has nothing to do with the motion that's before the Court now." (R. 353.)

Immediately before trial, Mr. Thomas' trial counsel filed a motion to reconsider the court's ruling excluding Howell's statements to Fricks and argued that even if Howell's confession to Fricks was itself inadmissible, it sufficiently corroborated Howell's confession to Rockford Police detectives to render the police confession admissible as substantive evidence. (R. 682-83; C. 466-67.) The court denied the motion. (R. 684.) Instead, the court granted the State's motion to bar *any* witness from discussing *any* statements by Howell. (C. 478, 484-85; R. 659.)

### Trial and Relevant Post-Trial Motion

At trial, the State's case relied almost exclusively on eyewitness testimony from Minishia Harris, Eva Pennie, and Nikita Bernel-Hill. Mr. Thomas maintained he was elsewhere at the time of the crime, and he was identified as the shooter by mistake. Due to the court's pre-trial rulings, Mr. Thomas was forbidden from

introducing the strongest evidence in support of his defense—that Nathaniel Howell had killed Nunn and confessed to it.

Minishia Harris ("Minishia") testified that at about 9:15 p.m. on April 3, 2007, she heard gunshots and peeked through the blinds of her front window of her apartment at 1510 Birch Court. (R. 1154-55.) Minishia saw Nunn crawling on the ground with the shooter standing over him. Minishia estimated the shooter to be about ten to fifteen feet away from her apartment.[3] Minishia claimed she got a "good glimpse" of the shooter but could only describe him as wearing a black hoodie sweatshirt and/or having braids in his hair.[4] (R. 1156.) Minishia said the shooter ran west toward Garden Court, and that she heard a loud car muffler shortly after. (R. 1196.)

Minishia admitted that she spoke to police on the night of the murder and did not identify Mr. Thomas as the shooter despite knowing Mr. Thomas prior to the shooting. (R. 1201.) Minishia testified further that on April 29, 2007—about three weeks after the murder— she saw the police chase and take into custody the shooter and "Tommy." (R. 1165, 1191-92.) Minishia said that she called the police and told them "they had the person who killed Lavontaye" (R. 1165), meaning the person who was arrested alongside Tommy. (R. 1191-92.) Minishia confirmed that that she saw Tommy and the shooter "get picked up by police . . . in the same place by the same

---

[3] The distance between Minishia's apartment and the site of the shooting was more than thirty feet, according to Rockford Police's diagram report (C. 1839.)

[4] Previously, Minishia had told the police that the shooter wore a do-rag (R. 1547), though she denied doing so at trial. (R. 1203.)

officer." (R. 1191-92.). Tommy Moore and *Nathaniel Howell* were arrested together on April 29, 2007. (R. 1624, 1627.)

Nikita Bernel-Hill testified that she was asleep in her apartment at 1407 Birch Court when she heard gunshots. (R. 1293-95.) Bernel-Hill went to her kids' bedroom, looked out the window, and saw an individual, whom she later identified as Mr. Thomas, run past wearing a black hoodie and carrying a gun in his waistband.[5] (R. 1296-97.) Bernel-Hill said the shooter bent down to pick up a cell phone off the ground and then ran east toward Birch Court (the opposite direction to which Minishia testified). (R. 1301-03.) Bernel-Hill said that the shooter got into a car, which drove south on Birch Court. Prior to Mr. Thomas' trial, Bernel-Hill wrote a letter to the state's attorney requesting drug court probation on her pending drug case. (R. 1351-54.) Bernel-Hill wrote that she should not have to go to trial on her pending case and testify against Mr. Thomas. (R. 1353-54.)

Eva Pennie testified that on the night of the shooting, she was standing with Nunn in the courtyard of the 1500 block of Birch Court. (R. 1239.) Pennie noticed someone walking up and down the courtyard just prior to the shooting, but when she looked for that person again, she did not see them.  (R. 1240.) Then Pennie felt someone brush against her from behind and begin shooting. (R. 1240-41.) Pennie saw

---

[5] Bernel-Hill previously gave police different details about the shooting that she did not testify to at trial. In earlier statements, Bernel-Hill stated that the shooter was wearing a black hat with a letter "B" on it and that she looked at the door, not the window, of her kids' room. (R. 1336-37.)

Nunn being shot multiple times and one bullet grazed her face. (R. 1240-42.) Pennie ran. (*Id.*)

The day after the shooting, Pennie gave a statement to the police but did not identify the shooter. (R. 419-20, 1244.) On April 29, 2007, police showed Pennie a photo array with Mr. Thomas in it, and still, Pennie failed to identify anyone. (R. 420, 1499-1501, 1508; E. 18.) On May 2, 2007, police showed Pennie a different photo array, which—unbeknownst to the jury—contained a photo of Howell, and Pennie quickly became uncooperative. (R. 1555-56; E. 23.) On May 16, 2007, police went to speak with Pennie again, but Pennie ran because she had a warrant out for her arrest. (R. 1496-97.) After apprehending Pennie, the police informed her that they thought she was lying concerning the Nunn murder and that she was in "a lot of trouble." (R. 422.) The police then showed Pennie another photo array, which contained the same photo of Mr. Thomas as the April 29 photo array, and then Pennie identified Mr. Thomas as the shooter. (R. 1490-91, 1496, 1508; E. 23.) At Mr. Thomas' trial, Pennie testified that she did not see the shooter in the courtroom. (R. 1243.)

Due to the court's pre-trial evidentiary rulings, Mr. Thomas was effectively precluded from introducing any evidence that Nathaniel Howell killed Nunn. Mr. Thomas asserted an alibi defense, arguing that he could not have committed the crime because he was at Swedish American Hospital trying to visit a friend around the time of the shooting. Kimberly Keys testified that she drove to Swedish American with Mr. Thomas, Tavares Daniels (aka Punkin), and Demari Ingram, to visit a friend. (R. 1562, 1578, 1593.) Keys testified that when they arrived at the hospital,

they parked and walked to the main entrance doors, but those doors were locked. (R. 1583-84.) The group went back to the car and drove to the emergency room entrance. (R. 1584.) Once they arrived, hospital personnel told them that they could not visit. (R. 1584.) They stood in the waiting room for about five minutes and then left. (R. 1585.) Emergency room surveillance video confirmed Keys' testimony and showed all four standing in the waiting room at 9:39 p.m.—less than a half-hour after the time the witnesses said they heard gunshots. (R. 1589-90.)

In rebuttal, the State called Rockford detective Jeff Schroder, who testified that he conducted a "time study" of the route from Blackhawk to SwedishAmerican. (R. 1657-64.) Schroder testified it took him six to eight minutes to make the commute; thus, according to the State, Mr. Thomas had ample time to commit the murder and go to SwedishAmerican. (*Id.*) Schroder admitted, however, that when he timed the route, he did not park at the main entrance parking lot and walk to the main entrance. (R. 1667.) Instead, Schroder drove directly to main entrance doors, waited "for a few seconds in his vehicle," and then drove to the emergency room entrance. (*Id.*)

The jury found Mr. Thomas guilty of first-degree murder and personally discharging the firearm that caused Nunn's death. (R. 1789, 1791.) The jury that convicted Mr. Thomas never heard about Howell or his multiple confessions to murdering Nunn.

After the verdict, Mr. Thomas' trial counsel filed a motion for a new trial arguing, among other things, that the court erred in barring Howell's confession to

Fricks, barring Howell's confession to detectives, and granting the State's motion to bar any witnesses from mentioning any statements by Howell. (C. 588-90.) As to Howell's confession to Fricks, Mr. Thomas' trial counsel argued that, at a minimum, the hearing on the motion to compel Fricks' testimony—which was terminated after Howell's appointed counsel asserted clergy-penitent privilege—should have been continued to address the *Chambers* factors. (R. 1808, 1813-14; C. 589.) As to Howell's confession to Rockford police detectives, Mr. Thomas' trial counsel argued that there was enough evidence to allow the jury to hear Howell's confession. (*Id.*) In part because Howell's confession to Fricks would have corroborated Howell's statement to the police. (C. 589-90.) Mr. Thomas' trial counsel argued that the exclusion of Howell's two confessions "[rose] to a due process violation" in that Mr. Thomas was prevented from introducing Howell's admissions in any way. (R. 1812-13.) The court denied the motion. (R. 1844.)

### Direct Appeal

On direct appeal, Mr. Thomas was represented by attorney Kim Fawcett of Illinois' Office of the State Appellate Defender. Fawcett *did not* challenge the trial court's exclusion of Howell's statement to Fricks. Nor did appellate counsel argue that Fricks' testimony corroborated Howell's confession to the police. Instead, Fawcett made five other arguments:

(1) there was reasonable doubt where the shooter was not wearing short pants and Mr. Thomas was; (2) the trial court abused its discretion and deprived Mr. Thomas of a fair trial by refusing the deliberating jury's request to view the hospital

security videotape which was neutral evidence of Mr. Thomas' alibi defense; (3) the suppression hearing court erred by denying the motions to suppress identifications by three state witnesses; (4) the trial court erred by excluding the statement "I did it" by juvenile N.H. to the police less than a month after the murder; and (5) the trial court erred by refusing to instruct the jury with Mr. Thomas' request instruction on the bias of a State's witness who is arrested and charged.

The Appellate Court of Illinois, Second District, affirmed Mr. Thomas' conviction and sentence in an unpublished decision. *People v. Thomas*, 2011 IL App (2d) 091061-U ("*Thomas I*"). Mr. Thomas filed a Petition for Leave to Appeal to the Illinois Supreme Court on December 1, 2011, which was denied on January 25, 2012. *People v. Thomas*, 963 N.E.2d 250 (Ill. 2012).

### Post-Conviction Proceedings

On June 26, 2012, Mr. Thomas timely filed a *pro se* post-conviction petition alleging, in part, that his appellate counsel was ineffective for failing to raise a fully preserved and potentially meritorious issue relating to the trial court's exclusion of Howell's confession to Fricks and his confession to police. (C. 655-724). The judge dismissed Mr. Thomas' petition at the first stage, and Mr. Thomas appealed. (C. 726, 731.) After a lengthy analysis, the appellate court reversed the first-stage dismissal and remanded, holding:

> [f]ailing to raise on direct appeal the potentially meritorious claim for a new trial in light of the exclusion of Chaplain Fricks' testimony was arguably objectively unreasonable and not a matter of trial strategy ... Moreover, [Mr. Thomas] has shown that [appellate] counsel's performance arguably rendered the result of the trial unreliable in that Chaplain Fricks' testimony could have affected the verdict by proving

14

defendant's innocence. *People v. Thomas*, 2014 IL App (2d) 121001 ("*Thomas II*") ¶ 100 (internal citations omitted).

The appellate court further stated the "record and law potentially support[ed]" the arguments that Mr. Thomas' appellate counsel "mishandled the admissibility of [Howell's] alleged confessions to the detectives and the chaplain." *Thomas II,* ¶ 5. The appellate court concluded that the trial court's decision to exclude Fricks' testimony based on clergy-penitent privilege was "not supported by the evidence adduced at the hearing." *Thomas II,* ¶ 95. The court remanded for further post-conviction proceedings. *Thomas II,* ¶ 105.[7]

On remand, through counsel, Mr. Thomas filed an Amended Verified Petition for Post-Conviction Relief. (C. 796.) Mr. Thomas asserted, among other things, a claim of ineffective assistance of appellate counsel for the failure to challenge the trial court's exclusion of Fricks' testimony or argue that Fricks' testimony corroborated Howell's confession to police. The State moved to dismiss. After briefing and argument, the post-conviction court denied the State's motion to dismiss the ineffective assistance of appellate counsel claim and advanced that claim to a third-stage evidentiary hearing. (C. 1030-49, 1106-10.) The post-conviction court further ordered a third-stage evidentiary hearing "includ[ing] a new hearing on an amended motion in the trial court seeking the admission of any or all statements attributed to N.H., either to detectives, or to Chaplain Fricks, or both." (C. 1108.)

At the third-stage evidentiary hearing, Mr. Thomas presented six witnesses whose testimony addressed Mr. Thomas' ineffective assistance of appellate counsel claim and the admissibility of Howell's statements to Fricks and detectives on an

15

amended motion in the trial court.[6] One of those witnesses was Fricks, who testified consistently with his 2008 pre-trial testimony and provided additional details on Howell's confessions. Fricks elaborated on the spontaneous nature of Howell's confession. (R. 2339.) Fricks also testified that at the time of the confession he was a "mentor" and "role model" to Howell. (R. 2338.) Fricks further testified that over the years, Fricks and Howell developed a "father and son relationship." (R. 2342.)

Among other witnesses, the State called Mr. Thomas' appellate counsel, Kim Fawcett, who testified as follows:

Fawcett was assigned as Mr. Thomas' appellate counsel on direct appeal in 2010. (R. 2372.) Fawcett focused first on the admissibility of Howell's "I did it" statement to police, because he was familiar with the *Chambers v. Mississippi* decision based on his previous work. (R. 2394-95.) Fawcett believed the "I did it" statement was admissible because it satisfied most of the *Chambers* factors. (R 2377.) Fawcett believed that Howell's recantation to the police did not hurt this issue because Howell had ample time to change his mind about confessing while the police prepared to videotape him. (R 2378-79.) Fawcett eventually incorporated this argument, but it was the second to last issue in his brief. (C. 956-60.)

Fawcett testified that he was aware of the confession Howell made to Fricks, but chose not to include that issue in the brief because Fawcett agreed with the trial court's decision to bar Fricks' testimony. (R. 2405-06.) Specifically, Fawcett said the trial court's ruling was "fair" because Howell thought his conversations with Fricks

---

[6] After being granted leave by the court, Mr. Thomas supplemented his Amended Petition with a claim of actual innocence

were confidential, and Fricks never informed Howell otherwise. (R. 2387.) When asked about the Illinois Supreme Court's decision in *People v. Bole*[7], which held that privilege does not turn on a subjective expectation of confidentiality, Fawcett said he was aware of the decision. (R. 2407.)

When asked about the appellate court's 2014 ruling that Howell's statements to Fricks were not protected by clergy-penitent privilege, Fawcett doubled down on his own interpretation and said that the Illinois appellate court got it wrong in 2014. (R. 2412.) As support for his refusal to make an argument about clergy-penitent privilege on direct appeal in 2011, Fawcett pointed to *People v. Peterson*—a case decided nearly six years after Mr. Thomas' direct appeal.[8] Fawcett remained convinced that *Peterson* supported his reasoning despite acknowledging that the court in *Peterson* found that privilege did not apply because the clergyman in *Peterson* testified that his religion did not bind him to confidentiality. (R. 2412-2413.)

Mr. Thomas' appellate counsel also testified that he believed the court's clergy-penitent privilege ruling was actually helpful to Mr. Thomas because the trial judge's privilege ruling carried over to Mr. Thomas' conversations with Fricks. (R. 2386.) Fawcett could not point to any particular statements by Mr. Thomas that would benefit from this protection. Rather, he agreed with the State's attorney that he

---

[7] 223 Ill. App. 3d 247 (1991), *aff'd*, 155 Ill. 2d 188
[8] Fawcett did not give a full citation, but presumably, he meant *People v. Peterson*, 2017 IL 120331, which affirmed the Third District's ruling in *People v. Peterson*, 2015 IL App. 3d 130157, that clergy-penitent privilege did not bar a pastor's testimony about an individual's inculpatory statements.

recalled Mr. Thomas' statements to Fricks placing Mr. Thomas in the area of the murder at the time it occurred. (R. 2385, 2397.)

Finally, Fawcett argued that, in any event, Howell's statements to Fricks were inadmissible as a statement against penal interest because it "was a failure on all four [*Chambers*] points." (R. 2381.) According to Fawcett, Howell allegedly did not tell Fricks that he had recanted his confession to the police, so all of his statements to Fricks were not trustworthy. (R 2400-01.) Fawcett conceded that Fricks was never asked whether Howell told Fricks that he recanted. (R 2401.) Nonetheless, Fawcett decided the statements to Fricks would be harmful to his argument about Howell's confession to the Rockford police. (R 2387.)

On February 5, 2021, "based on the evidence, exhibits, arguments, and authorities presented," the post-conviction trial court granted Mr. Thomas' post-conviction petition with respect to his claim of ineffective assistance of appellate counsel. (C. 1985, 1995.) The court found that Fawcett was a credible witness and while his testimony at the third-stage evidentiary hearing was sincere, his rationale for not challenging the exclusion of Howell's statements to Fricks "was inconsistent with both the facts . . . and existing appellate authority on the issue of clergy-penitent privilege under 735 ILCS 5/8-803." (C. 1990, 1993.) The court was troubled by appellate counsel's refusal to raise a meritorious issue based on an "inappropriate level of concern for the 'fairness' to Howell." (C. 1990.) The court found that appellate counsel "demonstrated 'ignorance on a point of law' and either a 'failure to perform

basic research on that point' or, alternatively, [a] failure to even recognize the point of law at issue." (C. 1993.)

Following the above findings, the court ruled that absent appellate counsel's deficient performance in this regard it is more likely than not that the appellate would have reversed Mr. Thomas' conviction. (C. 1993-94.) Accordingly, the post-conviction court vacated Mr. Thomas' conviction and ordered a new trial. (C. 1994.) The State appealed.

### Additional Post-Conviction Evidence Pertinent to Mr. Thomas' Actual Innocence Claim

At the 2019 evidentiary hearing, new evidence surfaced that proved Mr. Thomas' innocence and established Nathaniel Howell as the true perpetrator of the murder of Lavontaye Nunn. Over the course of the three-day evidentiary hearing, Mr. Thomas called six witnesses and entered twenty-five exhibits into evidence. The State presented five witnesses, and entered one exhibit. The following evidence was presented and is relevant to Mr. Thomas' actual innocence claim.

### Stedman Dismuke (Petitioner's witness, April 16, 2019) (R. 2213-2284)

Stedman Dismuke testified for the first time that he witnessed Nathaniel Howell—not Marquis Thomas—shoot and kill Lavontaye Nunn. (R. 2217, 2221-22, 2233.) On the evening of the murder, Dismuke was at his sister Jennifer's home at 1509 Birch Court in Blackhawk, and was hanging out with a friend named Keyera[9] who lived next door at 1511 Birch Court. (R. 2214-15.) Between two nearby buildings,

---

[9] The transcripts reflect the spelling of this name as "Keirra." Mr. Thomas believes this friend's name is "Keyera."

he heard the voices of "Trapper" (Tommy Moore), whom he knew, and Moore's "homie" Howell, whom Dismuke had seen before but whose name Dismuke did not know. (R. 2220-21; 2458.) Dismuke did not see Mr. Thomas in the area that night. (R. 2233.)

Before the shooting, Dismuke saw Nunn standing with Eva Pennie in front of Dismuke's sister's apartment. (R. 2224.) Dismuke had given Nunn the hoodie he was wearing that night because Nunn had no jacket. (R. 2229.) Dismuke knew Pennie because she was his best friend's sister. (R. 2225.)

Dismuke was standing on the porch between 1509 Birch (Jennifer's apartment) and 1511 Birch (Keyera's apartment) when Howell ran up, shot Nunn several times, and then ran away. (R. 2227-29; Pet. Ex. 4.) Dismuke identified a photo of Howell as the shooter at the evidentiary hearing. (R. 2221-22, 2335.) Dismuke watched Nunn die. (R. 2229.) Dismuke repeatedly described being in shock after witnessing the murder, which was the first time he had seen anyone killed. (R. 2228, 2233.) Dismuke had seen Pennie by Nunn when he was shot, but he did not know what happened to her after the shooting. (R. 2228.) Dismuke did not recall speaking to police at the scene, but he remembered going to the police station that evening. (R. 2231, 2246.) Dismuke could not remember everything he told the police but he admitted that he lied when he said he did not see the shooting. (R. 2231.)

Dismuke, a 17-year-old boy at the time of the shooting, did not initially admit that he witnessed the murder because he was afraid of anyone thinking he had said something to the police. (R. 2231, 2274.) After the shooting, he stayed away from Blackhawk for a time. (R. 2233.) Dismuke was not aware of Mr. Thomas' murder trial

when it was occurring. (R. 2233-34.) Dismuke had seen Mr. Thomas before, but he had never spoken to him. (R. 2233.) Dismuke agreed to tell the truth now because he is more mature (at 29 years old) and because he believes it is not right for someone to be locked up for something he did not do. (R. 2334.)

### Toi McKinney (Petitioner's witness, June 4, 2019) (R. 2457-2511)

Toi McKinney lived in Blackhawk at 1513 Meadow Court in April 2007. (R. 2457-58.) At the time, her boyfriend was Tommy Moore, who was also known as "Trapper." (R. 2458, 2467.)

Shortly before the Nunn shooting, McKinney had been sitting on a green box she referred to as the "green machine," on Birch Court. (R. 2459, 2463.) She left that location and went inside the apartment of Moore's aunt Sonja. (R. 2460.) While there, McKinney heard gunshots. (R. 2461.) Before the ambulance arrived, Howell entered the apartment and said to Moore, "I did it. I did it." (R. 2461, 2463, 2478.) Howell was dressed all in black, and looked nervous, energetic, and jittery. (R. 2473, 2478.) At the time of the shooting, McKinney had known Howell, whom she called "Four," for a few months through Moore; she saw Howell and Moore together three or four times a week. (R. 2462, 2474.)

Moore took Howell upstairs. (R. 2463.) McKinney went outside where she saw a young man she did not know lying on the ground, not moving. (R. 2463.) McKinney went back to Moore's aunt's house, called a family member, and left 30 minutes later. (R. 2464.) She believed Moore and Howell were still upstairs at the time. (R. 2464.) McKinney returned to the apartment early the next morning. (R. 2464.) Police

21

knocked on the door and, at Moore's instruction, McKinney told them Moore was not there. (R. 2464-65.) The officers saw Moore looking out of a window and arrested him. (R. 2465.)

A few months after the shooting, McKinney told an investigator from the Public Defender's office what happened that night and what Howell said. (R. 2488-90.) McKinney signed a statement without reading it because she was anxious to leave the lengthy interview. McKinney said her statement was largely correct but acknowledged that the statement contained minor errors, including where in the aunt's house she was when she heard gunshots, and whether Moore was acting paranoid after the shooting. (R. 2486-87, 2489, 2500-2511.)

### Marcellus Motton (Petitioner's witness, April 16, 2019) (R. 2294-2330)

Marcellus Motton, a maintenance technician and homeowner who lives in Madison, Wisconsin, testified that Nathaniel Howell also told Motton that he killed Nunn. (R. 2295, 2300-05.) Two days prior to Nunn's murder, Motton was shot in Blackhawk. (R. 2296.) Motton was inside an apartment with Nunn and Darius Foster, but Motton fled the apartment after becoming involved in an altercation with Foster. (R. 2296-98.) Foster shot Motton twice in the leg as Motton ran, and Motton was admitted to Swedish American Hospital that day. (R. 2298.)

Howell, whom Motton knew from the projects as "Shorty Four," visited Motton in the hospital on or about April 5, 2007, and said that he had shot and killed Nunn. (R. 2300-05.) Howell said he had found out that Nunn had something to do with Motton getting shot, and Howell had shot Nunn in retaliation. (R. 2302.) According

22

to Howell, Nunn had told Foster and others that Motton had a lot of money on him and that they should try to rob Motton. (R. 2303.) Motton was shocked to hear this, as he previously had no reason to think Nunn had anything to do with his shooting. (R. 2303-04.) Howell seemed to be trying to impress Motton and seeking acknowledgment that he had done something good by shooting Nunn. (R. 2305, 2320.)

Motton testified that he spoke to detectives about the Nunn shooting shortly after he left the hospital, but he did not recall the details of that conversation. (R. 2313-15.) Motton did recall that officers obtained his phone from the jail. (R. 2315.) Motton testified that about a year after Howell confessed to him, Motton told Rockford Police Detective Bruno that Howell had killed Nunn, hoping the information would help him in relation to pending charges.[10] (R. 2328.) Specifically, Motton told Bruno that people were saying Howell committed the murder; Motton did not tell Bruno that Howell actually confessed to him. (R. 2330.) Motton received no benefit from talking to Bruno. (R. 2328.)

At the time of Nunn's murder, Motton had known Mr. Thomas for less than two weeks. (R. 2306, 2309.) Motton knew about Mr. Thomas' trial, but never spoke with Mr. Thomas' attorneys because he feared retaliation and because Howell was still on the street. (R. 2306.) Motton described Howell as wild, very aggressive, hot-headed, and known to carry guns. (R. 2325.) According to Motton, "Marquis just wasn't any of my concern. I didn't know him like that." (R. 2319.) He knew Mr. Thomas had been convicted of Nunn's murder, but Motton told no one about Howell's

_____

[10] No police report that has been disclosed to Thomas' counsel reflects this conversation.

confession until 2019, when Mr. Thomas' post-conviction attorneys contacted him. (R. 2319.)

### Wayne Fricks (Petitioner's witness, April 16, 2019) (R. 2331-2350)

At the time of the evidentiary hearing, Wayne Fricks lived in Milwaukee, Wisconsin, and worked as a skilled machinist. (R. 2332.) He confirmed that his 2008 pretrial testimony was truthful, and that his memory about these facts was better at that time. (R. 2333.)

Fricks reiterated that in 2007, he was the juvenile chaplain at the JDC and worked for the Rockford Reachout Jail Ministry. (R. 2337, 2343.) One day at the JDC, Howell told Fricks that he had fatally shot someone in Blackhawk.[11] (R. 2339.) Howell was remorseful and said it was tormenting him. (R. 2339.) Howell related that a person named Blackie had been charged with the murder that Howell had committed. (R. 2339, 2350.) Fricks did not know then who Blackie was, but later learned Blackie was Marquis Thomas. (R. 2339-40.) While employed at Rockford Reachout Jail Ministry, Fricks also sometimes went to the county jail. (R. 2340.) Mr. Thomas requested a meeting with Fricks at the jail, and told Fricks that a young man in the JDC named Marcus had shot and killed Nunn. (R. 2341-42.) Fricks figured out that Marcus was Nathaniel Howell. (R. 2341.)

Fricks and Howell had three or four conversations about the shooting, but after that they no longer discussed it. (R. 2344.) Howell told Fricks that Howell admitted

---

[11] This conversation likely occurred on or before May 1, 2007, based on JDC visitor logs and the May 7 date of Howell's "I did it" statement to the police. Although Fricks could not say for certain which days he visited Howell, Fricks confirmed his signature on JDC visitor logs on May 1, May 8, and November 27, 2007. (R. 2336-37; Pet. Ex. 12.)

the murder to the police but they would not listen. (R. 2347.) Howell did not, however, tell Fricks that he had retracted his statement to the police. (R. 2348.) Fricks had a close relationship with Howell and had bonded with him as a mentor and role model before Howell told Fricks about the Nunn shooting. (R. 2338-39.) Fricks and Howell remained close in the years that followed; Fricks often had Howell in his home, and he considered Howell family. (R. 2342.)

### Cordell Thurman (Petitioner's witness, June 4, 2019) (R. 2521-2565)

Cordell Thurman is Nathaniel Howell's older brother; the two were close before Howell died. (R. 2523, 2560.) Howell went by "Marcus," his middle name. (R. 2529.) Thurman testified that Howell had admitted to him on multiple occasions that Howell had shot Lavontaye Nunn. (R. 2525.)

Thurman recalled that he was in the Winnebago County Jail when Nunn was murdered; he learned about it over the phone from relatives and friends. (R. 2524, 2540-41.) Thurman did not know Nunn. (R. 2524.) Thurman spoke briefly with Howell about the shooting in June 2007 while Thurman was still in jail, but the first time the brothers sat down and talked about it in detail was after Thurman's release in August 2007. (R. 2525, 2527, 2557.)

During the August 2007 conversation, Howell said that he had fatally shot someone, and that Mr. Thomas had been charged even though he was not involved. (R. 2530-32.) Howell added that he had tried to speak with several people about this and had even told the police, but the police did not believe him. (R. 2531, 2533.) Thurman told Howell he was stupid for telling the police. (R. 2533, 2558.) Howell did

not tell Thurman about his recantation to the police. (R. 2559.) Howell did not go into detail about the shooting but told Thurman that a female was present at the shooting, it was dark out, and Howell was wearing a hood. (R. 2435.) The brothers spoke about the shooting several more times, most recently about a year before Thurman's testimony at the post-conviction evidentiary hearing. (R. 2533.)

Howell also told Thurman that he had confessed to the chaplain about the shooting. (R. 2532.) While Thurman was in jail, Fricks contacted Thurman and said he (Fricks) had just spoken to Howell, and Howell was feeling remorseful. (R. 2533.) Fricks asked Thurman whether there was any way Thurman could help, but Thurman pointed out that he was locked up and could do nothing. (R. 2532.) Thurman and Howell's mother also knew Howell was involved. (R. 2525-26, 2550.) She died in January 2019, before Thurman spoke to Mr. Thomas' attorneys. (R. 2560.)

At the time of Nunn's murder, Thurman had never met Mr. Thomas. (R. 2563.) Mr. Thomas had recently come to Rockford from Chicago, and Thurman learned about him through relatives and mutual friends. (R. 2554-55.) Thurman first met Mr. Thomas when they were both in jail in late 2007. (R. 2545, 2552.) Mr. Thomas intervened in a conversation Thurman was having with other people and asked whether Thurman knew Howell, then said that he (Mr. Thomas) was locked up for Howell's crime. (R. 2551.) Thurman did not confirm that his brother was the shooter at that time, but he expressed sympathy for Mr. Thomas' plight. (R. 2552.)

Thurman first revealed Howell's admissions to him after both Howell and their mother had died, when Mr. Thomas' post-conviction attorney contacted him. (R. 2560-

61.) If Mr. Thomas' trial attorneys had reached out to Thurman in 2007 or 2008, Thurman would "absolutely not" have told them what his brother had done. (R. 2561-62.)

### Eric Harris (Petitioner's witness, July 1, 2019) (R. 2694-2732)

Eric Harris was a Rockford Police detective in 2007 and the lead detective investigating the Nunn murder. (R. 2697.) On May 7, 2007, Harris and Detective Posley interviewed Howell. (R. 2697.) Harris and Posley removed Howell from the Rockford JDC and transported him to the Detective Bureau at 9:50 a.m. (R. 2700.) Howell was put into an interview room and signed a Rights Form at 10:33 a.m. (Pet. Ex. 20; R. 2701-02.) The Rockford Police viewed him as a suspect in Nunn's murder. (R. 2701-02.) Harris admitted that he had told Howell before the questioning began that he wanted to speak to him specifically about the Nunn murder. (R. 2700.) Harris testified that Howell said, "I did it," in reference to the murder of Nunn. (R. 2709-10.) Harris stated that he and Posley then stopped the interview, and there was no subsequent conversation until a recording began. (R. 2726-27.)

During the recorded portion of Howell's May 7, 2007 interview, Harris and Posley asked Howell to tell them how and why Nunn was killed. (R. 2728.) Howell responded that "Nunn was killed because . . . Marcellus Motton suspected Nunn of setting up Motton and getting robbed." (R. 2728.)

### Nathaniel Howell Interview Videotape – May 7, 2007

During the State's case, Mr. Thomas introduced into evidence the police recording of Howell's May 7, 2007, police interview, which began after Howell

confessed. (Pet. Ex. 17.) The recorded portion of the interview lasts for approximately an hour and a half. (Pet. Ex. 16.) At 8:52 minutes[12], an individual asks Howell if he needs to use the bathroom, and escorts Howell out of the room. (Pet. Exs. 16, 17.) While on the stand, Solis conceded that the voice of the individual—identified as "Unknown" in the interview transcript (Pet. Ex. 6)—sounded like him. (R. 2614.)

Howell leaves the room. (Pet Ex. 17 8:55 mins–12:13 mins.) While outside of the room, at 9:02 minutes, Howell asks, "what do you think I'll be charged with?" (Pet. Ex. 17 9:02 mins.) For nearly two-and-a-half minutes, Howell and Solis have a conversation outside of the room, which is partially transcribed in the transcript of Howell's May 7, 2007, interview. (Pet. Ex. 16, 4–5; Pet. Ex. 17 9:46 mins–12:10 mins.) At 12:09 minutes, Solis brings Howell back into the interview room; Solis is partially visible in the frame of the video. (Pet. Ex. 17 12:09 mins; R. 2621.)

Howell does not make another confession to the police during the recorded portion of his statement. He does, however, seem to say, "the truth is I did it," while alone in the interview room. (Pet. Ex. 17 38:05 mins; Pet. Ex. 17(a) 38:05 mins.)

### State's Post-Conviction Evidence

### Simon Solis (Respondent's witness, June 4, 2019) (R. 2574-2634)

Simon Solis was a Rockford Police detective in 2007. (R. 2575.) On April 3, 2007, Solis briefly interviewed 17-year-old Stedman Dismuke at the scene of the Nunn murder. (R. 2577.) Dismuke agreed to go with Solis to the police station and

---

[12] Aside from the beginning and end of the interview, which are documented in police reports, there is no way to determine the real time of events in the interview. Accordingly, all citations to Petitioner's Exhibit 17 are citations to the time stamp of the video, i.e., Pet. Ex. 17 at 8:46 mins means 8 minutes and 46 seconds into the recording, rather than 8:46 a.m. or 8:46 p.m.

spoke with Solis and Detective Eric Harris for roughly an hour. (R. 2579, 2596.) Dismuke told Solis and Harris that he was smoking with Nunn just before the murder, but he went inside before the murder happened. Dismuke stated that he heard five to eight gunshots, but he did not see the shooter. (R. 2584.)

On May 2, 2007, Solis and Detective Pruitt interviewed Howell, whose name surfaced during the Nunn investigation. (R. 2588.) Solis and Pruitt made contact with Howell at the JDC where Howell was being held on unrelated charges. Howell agreed to speak to Solis and Pruitt about the Nunn murder, and they transported him to the Detective Bureau. (R. 2599.) During that interview, Howell told the police various versions of events. First, he told Solis and Pruitt that he was not in Blackhawk on April 3, 2007. (R. 2602.) Solis and Pruitt told Howell that they knew he was in Blackhawk that night. Howell then changed his story, saying he was at Kathy Edwards' apartment with his mother and Edwards. (R. 2602-03.)

After detectives learned that Edwards was not home that night, they confronted Howell again. (R. 2603-04, 2626.) Solis told Howell that it "wasn't looking good for him," and Howell "needed to tell him something he didn't already know." (R. 2627, 2633.) Solis also told Howell not to protect "Blacky, Trapper, Punkin," even though Howell had never mentioned those names during the interview. (R. 2633.) Howell then told Solis and Pruitt a story about a conversation involving transporting a gun and agreed to give a written statement about that conversation. (R. 2633-34.) At 3:42 p.m.—nearly seven hours after Solis first made contact with Howell—Howell signed a written statement. (R. 2634.)

On May 7, 2007, five days after his own interview with Howell, Solis was asked to monitor the recording of another Howell interview. (R. 2604.) Solis was aware that earlier that day, Detectives Harris and Posley interviewed Howell about the Nunn murder, and Howell had said, "I did it." Solis started the video recording at 12:26 pm. (Pet. Ex. 17; R. 2606.) At the evidentiary hearing, Solis identified his voice on the video recording when he escorted Howell out of the room. (R. 2614, 2621.)

### Scott Mastroianni (Respondent's witness, June 4, 2019) (R. 2635-44)

Scott Mastroianni was a Rockford Police detective on April 10, 2007, and testified that he interviewed Marcellus Motton that day about the Nunn murder. (R. 2636-38.) According to Mastroianni, Motton said he might be able to get information if he could have access to his Motorola chirp phone. (R. 2639.) Upon receiving his phone, Motton chirped a person he identified as "Kenny J." (R. 2640-41.) Mastroianni testified he could hear both sides of the conversation. (R. 2640.) According to Mastroianni, Motton asked the other person if he knew who was involved in Nunn's murder, and the other individual mentioned Tommy Moore and a friend of Moore who went by the name of Black or Blackie. (R. 2641.)

### Eric Bruno (Respondent's witness, June 4, 2019) (R. 2644-2667)

Eric Bruno interviewed a few witnesses in the Nunn investigation. (R. 2646.) Bruno testified that on the night of the shooting, he went to Tommy Moore's aunt's house at 1508 Meadow Court to find Moore, and while there, he encountered Toi McKinney, who was upset and refused to go to the police station. (R. 2663-65.) Bruno testified that the following day, in attempting to verify information provided by

Moore, he spoke by phone with a person he thought was McKinney. (R. 2662-63, 2666.) The person who answered the phone said she and Moore were inside Moore's aunt's house watching movies the previous evening, but she denied hearing gunshots. (R. 2664.)

McKinney had testified that she did not speak to the police by phone that day. (R. 2466, 2469-70.) She explained that Moore abused her and told her what to do. (R. 2458.) She was afraid of him even when he was not around. (R. 2491.) Although she had a phone, Moore had taken it from her and she did not generally have access to it. (R. 2470-72.)

Bruno also testified that in early 2008, he received word that Marcellus Motton wanted to speak with him. (R. 2647.) Bruno had a longstanding relationship with Motton during which Motton provided truthful information about various crimes when Motton was in trouble and wanted help with pending charges. (R. 2649, 2653.) Bruno and another detective met with Motton at the Winnebago County jail. (R. 2648.) Motton told Bruno he knew who had killed Nunn, but he would not provide details without assurance that his pending case would be dismissed—which Bruno did not provide. (R. 2652, 2654.) Bruno said he could not recall whether he documented this conversation, but he said he told Harris that Motton claimed to know who killed Nunn. (R. 2653-54.)

### Jeremiah Cizerle (Respondent's witness, July 1, 2019 (R. 2740-56)

Jeremiah Cizerle was a uniformed patrol officer on the night of Nunn's murder, and testified about his interactions with Dismuke that night. (R. 2741-2752.) When

31

Cizerle arrived on the scene, he saw Dismuke among the people standing around Nunn. (R. 2742.) Cizerle questioned Dismuke by the body and again in a squad car. (R. 2744, 2748.) Dismuke denied seeing the shooting or knowing who shot Nunn. (R. 2744, 2750.) According to Cizerle, Dismuke said the following: Dismuke was acquainted with Nunn, Nunn sold cocaine in the projects and was staying on the 1500 block of Meadow Court, Dismuke had smoked cannabis with Nunn before going inside, Dismuke heard gunshots ten minutes later, Dismuke came back outside and saw no one else around, and Dismuke turned over Nunn's body. (R. 2745-2748.) Cizerle acknowledged that witnesses to violent crimes sometimes deny having seen the crime out of fear for their safety. (R. 2755.)

## II. __ARGUMENT__

On federal habeas corpus review, an application for a writ of habeas corpus may be granted where the state court's adjudication of the claim has resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law. 28 U.S.C. § 2254(d)(1). An application for writ of habeas corpus may also be granted if the decision was based on an unreasonable determination of the facts in light of the evidence presented. 28 U.S.C. § 2254(d)(2). The State court adjudication(s), including the December 14, 2021 Order (attached as Exhibit 2 to Mr. Thomas' petition), were contrary to, or involved an unreasonable application of, clearly established federal law and were unreasonable in light of the evidence presented.

**GROUND 1: MR. THOMAS' CONVICTION SHOULD BE VACATED BECAUSE HE WAS DENIED THE EFFECTIVE ASSISTANCE OF APPELLATE COUNSEL GUARANTEED BY THE SIXTH AMENDMENT.**

Mr. Kim Fawcett, Mr. Thomas' counsel on direct appeal, failed to fulfill Mr. Thomas' constitutionally guaranteed right to effective counsel under the Sixth Amendment. Most notably, Fawcett chose not to challenge the trial court's exclusion of additional confessions made by Nathaniel Howell to a prison chaplain. The trial court erroneously concluded that Howell's confessions were barred by clergy-penitent privilege because Howell expected his conversations to be confidential. This ruling was in direct contravention to well-established Illinois Supreme Court precedent and presented an obvious argument for Fawcett to raise on appeal.

Yet, Fawcett chose not to raise this issue because he personally believed the ruling was "fair" to Howell. Fawcett ignored well-established legal precedent and facts in the record in choosing not to raise the issue. As the post-conviction trial court found, Fawcett's decision to not raise this argument was "legally erroneous" and "inconsistent with both the facts in the record he had available to him at the time of Mr. Thomas' direct appeal and with existing appellate authority on the issue of clergy-penitent privilege" under Illinois law. Mr. Fawcett failed to provide effective assistance of counsel, as guaranteed under the Sixth Amendment.

Claims for ineffective assistance of appellate counsel are analyzed using the framework set forth in *Strickland v. Washington,* 466 U.S. 668 (1984). To prevail on a claim of ineffective assistance of counsel, a petitioner must demonstrate: (1) that his counsel's performance was deficient, *i.e.*, the performance fell below an objective

standard of reasonableness; and (2) that he suffered prejudice as a result of that deficient performance. *Id.* at 687-88.

### A. Mr. Thomas' Appellate Counsel's Performance Was Objectively Unreasonable, Where Counsel Failed to Raise Any Issue Concerning Nathaniel Howell's Confession to Chaplain Fricks

While appellate counsel has discretion to decline to raise issues on appeal, there are limits to this authority. "[W]hen appellate counsel omits (without legitimate strategic purpose) 'a significant and obvious issue,' [the Seventh Circuit] will deem his performance deficient, and when that omitted issue 'may have resulted in a reversal of the conviction, or an order for a new trial,' we will deem the lack of effective assistance prejudicial." *Mason v. Hanks*, 97 F.3d 887, 893 (7th Cir. 1996) (internal citations omitted). "An attorney's ignorance of a point of law that is fundamental to his case combined with his failure to perform basic research on that point is a quintessential example of unreasonable performance under *Strickland*." *Hinton v. Alabama*, 571 U.S. 263, 274 (2014). Here, Fawcett's appraisal of the clergy-penitent privilege issue was plainly wrong and clouded by Fawcett's undue concern for "fairness" to Howell. The additional "reasons" that Fawcett provides for not raising this potentially meritorious argument are legally erroneous and contradicted by the record.

       1.   Appellate Counsel's Performance Was Objectively Unreasonable Where His Appraisal of the Merits of the Clergy-Penitent Privilege Issue Was Patently Wrong

It is undisputed that Fawcett did not challenge the trial court's exclusion of Fricks' testimony regarding Howell's confessions to him. At the evidentiary hearing,

Fawcett claimed he did not raise the issue because he believed the trial court's decision was correct because Howell *expected* his conversations to be confidential. The problem with Fawcett's reasoning is that it bears no resemblance to the test under Illinois' clergy-penitent privilege and is directly contradicted by Illinois appellate authority on the issue. A mistake of law is deficient performance. *Cates v. United States*, 882 F.3d 731, 736 (7th Cir. 2018).

Under Illinois' clergy-penitent privilege statute, conversations with clergy are protected by clergy-penitent privilege if the clergyperson is "enjoined by the rules or practices of such religious body or of the religion which he or she professes." 735 ILCS § 5/8-803. The two-step process for clergy-penitent privilege is well-established (and was at the time of Mr. Thomas' direct appeal): If the clergyperson does not object to testifying, the burden shifts to the declarant to prevent that testimony by showing that disclosure is prohibited by the rules or practices of the clergyperson's religion. *People v. Diercks,* 88 Ill. App. 3d 1073, 1077 (5th Dist. 1980). If the declarant does not show that disclosure is prohibited by the rules or practices of the clergyperson's religion, then there is no clergy-penitent privilege. Importantly, well before Mr. Thomas' direct appeal, the Illinois Supreme Court rejected the argument that the declarant's expectation of confidentiality is dispositive of whether the privilege arises. *People v. Bole*, 223 Ill. App. 3d 247 (1991), *aff'd*, 155 Ill. 2d 188.

In a pre-trial hearing, the clergyperson, Chaplain Wayne Fricks, testified that he did not object to testifying and that nothing in his Pentecostal religion prevented him from testifying. The burden then shifted to the declarant, Howell, to show that

35

Fricks' disclosure was prohibited by the rules of the Pentecostal religion. It is undisputed that Howell presented no evidence that the Pentecostal religion prohibited Fricks' disclosure. Based on the plain language of the statute, Fricks should have been permitted to finish his testimony on Howell's confessions and other statements. Instead, the trial court prevented Fricks from finishing his testimony and barred Fricks' testimony from trial based on clergy-penitent privilege because Howell *expected* his conversation with Fricks to be confidential. This decision contravened well-established law and presented an obvious argument for Fawcett to raise on appeal.

Yet, Fawcett did not raise this obvious issue on appeal because Fawcett personally agreed with the trial court's ruling. The trial court's ruling was, according to Fawcett, "correct" and "fair" because Howell *expected* his conversations with Fricks to be confidential and Fricks never informed him otherwise. Fawcett admitted that he was familiar with the Illinois Supreme Court's holding in *Bole* that clergy-penitent privilege does not turn on the declarant's expectation of confidentiality, but he nonetheless believed the trial court's ruling was correct. As the post-conviction trial court held, Fawcett's analysis was "inconsistent with both the facts in the record he had available to him at the time of Mr. Thomas' direct appeal and with existing appellate authority on the issue of clergy-penitent privilege." (C. 1993.) Simply put, Fawcett's reasoning for not challenging the exclusion of Fricks' testimony "demonstrated 'ignorance on a point of law' and either a 'failure to perform basic

research on that point' or alternatively, [a] failure to even recognize the point of law at issue." (C. 1993.)

> 2.   Fawcett's Performance Was Deficient By Failing To Argue An Issue That Was Obvious And Clearly Stronger Than The Issues Actually Raised.

For an ineffective assistance of counsel claim based on counsel's failure to raise an argument, the court must compare the claims actually presented to those that might have been presented to assess whether counsel performed deficiently. *Brown v. Brown*, 847 F.3d 502, 514 (7th Cir. 2017). Counsel's performance is deficient if he fails to argue an issue that is both "obvious" and "clearly stronger" than the issues actually raised. *Makiel v. Butler*, 782 F.3d 882, 898 (7th Cir. 2015). To be sure, the "pursuit of unsuccessful arguments and claims does not show ineffective assistance of counsel." *Brown,* 847 F.3d at 514. But, as here, where counsel chose to pursue "virtual loser[s]" and abandon non-frivolous claims that are "clearly stronger" than the claims presented, his performance is deficient. *Shaw v. Wilson*, 721 F.3d 908, 915 (7th Cir. 2013). Fawcett's performance was deficient because several of the arguments that he did raise were weak at best, and Fawcett chose not to include the "obvious" and "clearly stronger" argument regarding the exclusion of Howell's confession to Fricks.

In Fawcett's first argument, Fawcett argued that there was reasonable doubt because the shooter was not wearing shorts and Mr. Thomas was in the Swedish American surveillance video. (C. 912-65.) The appellate court quickly dismissed this argument for multiple reasons. Two of the three eyewitnesses did not specify the length of pants the shooter wore, and even if the shooter wore pants, the court said

there was nothing that prevented Mr. Thomas from changing from pants to shorts in the time before appearing on the SwedishAmerican surveillance video. *People v. Thomas*, 2011 IL App (2d) 091061-U ("*Thomas I*").

Next, Fawcett argued that the trial court committed reversible error by refusing to give the jury the SwedishAmerican surveillance video, even when the jury requested to view it during deliberations.[13] But, as the appellate court recognized, Fawcett failed to support this argument with even a single case in which the decision to *not* allow an exhibit to be given to the jury was found to be an abuse of discretion. *Thomas I*, at ¶ 32. Instead, Fawcett cited only inapposite cases in which the reviewing courts determined that the trial court did not abuse its discretion in *giving* the jury an exhibit during deliberations. *Thomas I*, at ¶ 32. To make matters worse, Fawcett's argument was even weaker because Fawcett argued that the error was not just an abuse of discretion but was so egregious as to warrant a new trial.

In the third argument, Fawcett failed to provide the court with a complete record to even analyze his argument. Fawcett argued the trial court erroneously allowed the jury to hear the identification testimony of the three eyewitnesses, in part, because the photographic lineup used to identify Mr. Thomas was unreliable and suggestive. Fawcett suggested that the lineup should have included a photo of Mr. Thomas from a prior arrest rather than a photo from his current arrest, but Fawcett "[did] not explain how or why a post-offense photograph would increase the risk of misidentification." *Thomas I*, at ¶ 47. The appellate court granted Fawcett

---

[13] The video was played in open court for the jury and referenced throughout the trial by both the State and Mr. Thomas. *Thomas I*, at ¶¶ 19, 34.

leave to supplement the record to add the prior arrest photo, but Fawcett either failed to add the photo or failed to properly identify the photo for the court. *Thomas I*, at ¶ 48. The court "resolved the incompleteness [of the record] against defendant." *Thomas I*, at ¶ 48. Due to the weakness of this argument and Fawcett's own failure to provide an adequate record, the court did not even need to reach the second step of the analysis. *Thomas I*, at ¶ 49.

In the final argument, Fawcett argued the trial court erred by using an IPI instruction on witness bias rather than the non-IPI instruction proposed by Mr. Thomas. The court dismissed this argument primarily because non-IPI instructions are not to be used when IPI instructions accurately state the law, which was the case here. *Thomas I*, at ¶ 48.

In sum, Fawcett elected to put forward several arguments that were "virtual loser[s]" to the exclusion of the "clearly stronger" issue of the exclusion of Howell's confessions to Fricks. The clear error in the trial court's exclusion of Howell's confessions to Fricks was (or at least should have been) apparent to Fawcett at the time of Mr. Thomas' direct appeal. Moreover, even if Fawcett had won on some of the arguments, the errors complained of would not have given Mr. Thomas a new trial. On the other hand, but for Fawcett's failure to raise this issue, Mr. Thomas would have prevailed on his appeal and likely would have been able to put the strongest evidence available to him before a jury on a new trial.

3. Appellate Counsel's "Reasons" For Not Raising Howell's Confession To Fricks Are Legally Erroneous And Unsupported By The Record

At the third-stage evidentiary hearing, Fawcett claimed he did not raise the trial court's exclusion of Fricks' testimony for other reasons too, but each of those reasons is unsupported by the record or inconsistent with sound appellate strategy.

First, Fawcett puzzlingly claimed that the inclusion of Howell's confession to Fricks would actually *hurt* Mr. Thomas' defense. Fawcett assumed that if Fricks were allowed to testify about conversations with Howell, then Fricks would also be permitted to testify about conversations with Mr. Thomas. But even if that were true, the record is clear that Mr. Thomas' statements to Fricks did not implicate him in Nunn's murder. Mr. Thomas told Fricks about the motive and basis for Nunn's murder, but Mr. Thomas explicitly told Fricks that Howell was the one who killed Nunn. Howell told Fricks the same thing. Howell was the only person who implicated himself in Nunn's murder in conversation with Fricks.

Second, Fawcett also erroneously believed that Howell's confession to Fricks would somehow "hurt" the admissibility of Howell's other confession to the police. Fawcett concluded that because Howell did not tell Fricks that he had recanted his confession to the police, all of Howell's statements to Fricks were untrustworthy. (R 2400-01.) But Fricks was never asked whether Howell told Fricks he had recanted his confession to police. (R. 2401.) Fawcett conceded that Fricks was never asked this question, yet Fawcett bases his entire reasoning on the fact that Howell definitively did not tell Fricks about his recantation. (R. 2401.) A strategic choice based on a

misunderstanding of fact can amount to ineffective assistance. *Vinyard v. United States*, 804 F.3d 1218, 1225 (7th Cir. 2015).

Finally, Fawcett ignored significant record evidence and legal precedent when he concluded that Howell's confessions to Fricks would have been inadmissible hearsay as a statement against penal interest. Illinois courts analyze the admissibility of a statement against penal interest using the four factors set forth in *Chambers v. Mississippi*: (1) the out of court statements were made spontaneously to a close acquaintance of the declarant shortly after the crime had occurred; (2) the statements were corroborated by some other evidence; (3) the confessions were incriminatory and against penal interest; and (4) there was adequate opportunity for cross-examination of the declarant. *Chambers v. Mississippi*, 410 U.S. 284, 300-01 (1973). Fawcett believed that Howell's confession to Fricks was a "total failure on all four factors," but that conclusion is belied by the evidence in the record.

On the first factor, Fawcett seemingly ignored well-established case law in concluding that Howell's confession to Fricks was not spontaneous because it was not "blurted out" and happened a month after the crime. (R. 2403.) But *Chambers* and its progeny do not require a statement to be "blurted out" absent a previous conversation. Each of the three confessions in *Chambers* occurred during conversations with friends and acquaintances. Howell told Fricks that "he had a lot on his heart," and Fricks invited Howell to express himself, and Howell confessed to killing Nunn (R. 274.) As the Illinois Supreme Court said in *People v. Tenney*, a "single, simple question [does] not rob the statement of spontaneity." *Tenney*, 205 Ill. 2d at 439.

41

Fawcett also asserted that Howell's confession to Fricks a month after the crime was "not shortly" after the crime. This conclusion also ignores a long line of Illinois cases that have found confessions made much later to be "shortly after the crime." *See, e.g.*, *People v. Kokoraleis,* 149 Ill. App. 3d 1000, 1021 (2d Dist. 1986) (admissions made over one month after the crime occurred); *People v. Tate* (1981), 87 Ill.2d 134 (1981) (admission occurred two months after crime); *People v. Nally*, 134 Ill.App.3d 865 (1985) (statement made after completion of defendant's first trial); *People v. Cunningham*, 130 Ill.App.3d 254 (1984) (statement made 17 months after the crime to a defense investigator); *People v. Martinez*, 129 Ill.App.3d 145 (1984) (statement made after defendants were convicted of the crime).

Fawcett then ignored record evidence in concluding that there was no corroboration for Howell's confession to Fricks. Fawcett's conclusion is particularly erroneous given the well-established case law that the threshold for corroboration is not high. "A court should not be stringent in determining whether the declarant's statement has been sufficiently corroborated, and the declaration should be admitted if the sufficiency of the corroboration is a close question." *Tenney*, 205 Ill. 2d at 437 (internal citations omitted). "[I]t must be remembered that this factor requires only that the statement be corroborated by 'some other evidence in the case." *Tenney*, 205 Ill. 2d at 437. Courts have found corroboration where details in the declarant's statements match other pieces of evidence or testimony in the case. *See, e.g., Tenney,* 205 Ill. 2d 411 at 437-38 (the type and color of vehicle used in the crime matched the declarant's statements); *People v. Human*, 331 Ill. App. 3d 809, 811 (1st Dist. 2002);

(statement of other witnesses aligned with declarant's statements); *People v. Taylor*, 287 Ill. App. 3d 800, 811 (5th Dist. 1997) (declarant's prior confession corroborated declarant's in-court confession).

Howell told Fricks that he shot somebody, that the individual had died, and that the shooting had taken place in Blackhawk Housing Projects. (R. 275, 2338-39.) These statements match the facts that Lavontaye Nunn was shot and killed in the Blackhawk on April 3, 2007. Fricks told Howell to "notify the authorities" that he had committed the crime. (R. 276.) Howell did tell authorities shortly after—when he confessed to Detective Harris and Posley. Additionally, Minishia Harris testified at trial that she saw the police chase and take the shooter into custody alongside someone she knew as Tommy. (R. 1164-65.) It was Howell, not Mr. Thomas, who was chased and apprehended with Tommy Moore that day. (R. 1624-25, 1627.) Furthermore, other people told the police during their investigation that Howell had committed the murder. (R. 164.) Finally, Fawcett failed to recognize that Howell's other confession to police corroborated his confession to Fricks. As noted in the *Chambers* opinion itself, multiple independent confessions provide corroboration for each other. *Chambers*, 410 U.S. at 300.

Fawcett's conclusion that Howell's confession to Fricks lacked any corroboration is also curious because it contradicts appellate counsel's own brief on direct appeal. When discussing the suppression of Howell's confession to police, *Fawcett himself* wrote in Mr. Thomas' opening brief, "conversations with the jail pastor, Mr. Frickes [sic], wherein *Mr. N.H. confessed to the murder*, were also

suppressed." (C. 956) (emphasis added). Appellate counsel knew that Howell confessed multiple times to the murder, but he still claimed at the evidentiary hearing that there was no corroboration for Howell's confession to Fricks. This testimony is directly at odds with the Supreme Court's language in *Chambers* that "independent confessions provide additional corroboration for each." 410 U.S. at 300.

On the third factor, it is apparent that Howell's confession to Fricks that he shot and killed someone was incriminatory and against his penal interest. Howell admitted he committed murder, and he knew he could face criminal liability because he knew that police were actively investigating the murder and had brought charges against Mr. Thomas for the crime. Fawcett said the third factor was not met because Howell expected his confession to remain confidential, but there are two problems with this conclusion. First, there is nothing in the record that supports this argument. Fricks never told Howell their conversations would remain confidential and there is no evidence that Howell expected his conversations to remain confidential. But even if there were such evidence, the declarant's expectation of confidentiality does not render statements not incriminatory. *See, e.g.*, *United States v. Badalamenti*, 626 F. Supp. 658, 666 (S.D.N.Y. 1986) ("Declarations against penal interest are received notwithstanding that they were spoken in confidence in the expectation they would not be repeated to the authorities"); *United States v. Goins*, 593 F.2d 88, 91 (8th Cir. 1979) (revelation to daughter admissible). Moreover, even if Fricks had not told a soul what Howell had said, Howell himself confessed to the police *after* Fricks suggested he do so. Howell cannot reasonably have thought he was not putting himself at risk

44

by confessing to both Fricks and the police. This factor weighs in favor of admitting Fricks' testimony, and appellate counsel's belief to the contrary illustrates ignorance of the law.

Appellate counsel said the fourth factor was not satisfied because Howell was exercising his privilege against testifying and was not available to testify. (R. 2381). Although Howell's court-appointed attorney for the clergy-penitent privilege issue stated that Howell would exercise his Fifth Amendment right if he were called at that time, Howell was never called to testify. We cannot know whether Howell would have exercised his privilege to not testify, or whether Howell, who had already admitted guilt twice, would have testified at trial. In any event, the declarant's availability for cross-examination is only one factor to consider, and a declarant's unavailability is not dispositive. *Cunningham v. Peters*, 941 F.2d 535, 541 (7th Cir. 1991). In any event, the declarant's availability for cross-examination is only one factor to consider, and a declarant's unavailability is not dispositive. *Id.* Illinois courts frequently rule in favor of admissibility even when cross-examination is not possible. *See, e.g., Tenney,* 205 Ill. 2d at 439; *People v. Swaggirt*, 282 Ill. App. 3d 692, 705 (2nd Dist. 1996); *Kokoraleis,* 149 Ill. App. 3d at 1024. All of these cases preceded Mr. Thomas' trial, and all were available to appellate counsel. In conclusion, Fawcett's rationale for failing to appeal the exclusion of Howell's confession to Fricks fails to make legal or logical sense.

The trial court's exclusion of Howell's confession to Fricks (and Howell's other confession to police) prevented Mr. Thomas from exercising one of the most

fundamental rights of a criminal defendant—the ability to present a complete defense. Fawcett's refusal to challenge the exclusion of Howell's confession to Fricks on appeal was objectively unreasonable and renders Fawcett's performance deficient under *Strickland*.

**B.** **Mr. Thomas Was Prejudiced by Appellate Counsel's Failure to Challenge the Exclusion of Nathaniel Howell's Confessions to Wayne Fricks**

The prejudice to Mr. Thomas is clear. Mr. Thomas was convicted of first-degree murder and sentenced to 55 years in prison. The trial court excluded all evidence that Nathaniel Howell confessed to committing the crime for which Mr. Thomas was charged. Had appellate counsel challenged the trial court's ruling excluding Howell's statements to Fricks, or at least argued that Howell's confession to Fricks corroborated his confession to the police, Mr. Thomas would have prevailed on appeal and his conviction would have been vacated. "Prejudice exists… if counsel bypasse[s] a nonfrivolous argument that, if successful, would have resulted in the vacation of [Petitioner's] conviction." *Shaw*, 721 F.3d at 918.

Had Fawcett actually raised Howell's additional confession and statements to Fricks, it would have resulted in the vacatur of Mr. Thomas' conviction, especially in light of the little evidence that was used to convict Mr. Thomas. At trial, the State's evidence consisted of three eyewitness identifications. The Seventh Circuit has long recognized the "shortcomings in human perception that so frequently render eyewitness testimony less reliable than other types of evidence." *U.S. ex rel. Hampton v. Leibach*, 347 F.3d 219, 253 (7th Cir. 2003) (internal citations omitted). Each of the eyewitness identifications suffered from deeper issues too. Here, only two people—

Minishia Harris and Nikita Bernel-Hill—testified at trial that Mr. Thomas was the shooter. However, these witnesses could only have obtained brief glances, at best, of parts of the shooter's face as he fled. (R. 1156-67, 1310.) The shooting occurred after dark, and both Harris and Bernel-Hill were inside their apartments at the time. (R. 1154-55, 1293-95.) In addition, both women were focused on loved ones in the immediate aftermath of the shooting—Bernel-Hill ran to check on her children, and Harris wanted to make sure her husband had not been shot. (R. 1204-05, 1296.) Bernel-Hill asked the State for a reduced sentence on a pending charge in exchange for her testimony (R. 1349-54), so she had motive to identify someone as the perpetrator, whether that identification was accurate or not. Harris testified at trial that she saw the shooter and Tommy Moore arrested together a few weeks after the murder. (R. 1164-65.) Since Howell, not Mr. Thomas, was arrested with Tommy Moore on the day about which Harris testified, this testimony signaled that Harris had misidentified Mr. Thomas as the shooter. (R. 1627.) A jury would likely give little weight to the tenuous identifications of these witnesses if also presented with multiple confessions from Howell.

Eva Pennie, the only trial witness who was standing directly next to Nunn at the time of the shooting, did not identify Mr. Thomas as the shooter at trial. Pennie identified Mr. Thomas as the shooter just one time, a month and a half after the murder, after she was arrested by the police and accused of lying about the Nunn case, saying she was in "a lot of trouble." (R. 1488-1491, 1497.) Later, Pennie signed a written statement recanting that identification and stating that Mr. Thomas did not kill Nunn.

(R. 1538, 1564-67.) Before her only identification of Mr. Thomas, Pennie was shown other lineups and did not identify Mr. Thomas as the shooter, and actually became uncooperative when shown a photo of Howell. (R. 416, 1499, 1508, 1555-56; E. 18, 23.) But the jury did not hear about this due to the trial court's pre-trial rulings forbidding any mention of Howell. (C. 484-85; R. 659) At trial, Pennie, consistent with her signed statement and notwithstanding the fact that she testified that the statement she had given previously was truthful. (R. 1243, 1254, 1263.)

Due to the trial court's erroneous rulings, Mr. Thomas was not allowed to present any evidence that Nathaniel Howell was the one who murdered Lavontaye Nunn, including Howell's own multiple confessions. Without testimony concerning Howell's confessions, Mr. Thomas was precluded from presenting a full defense, one of the most fundamental rights of a criminal defendant. *See, e.g., Holmes v. South Carolina*, 547 U.S. 319, 324 (2006) (the Constitution guarantees a meaningful opportunity to present a complete defense); *Crane v. Kentucky*, 476 U.S. 683, 690 (1986) (same). The trial court's pre-trial ruling prevented the jury from hearing the strongest piece of exonerating evidence in Mr. Thomas' case. Testimony from Fricks would have been a game changer, and likely would have made the difference between a guilty verdict and a not guilty verdict. Instead, Mr. Thomas' defense at trial—which was unsuccessful—was limited to a partial alibi and a general, unsupported assertion that the eyewitnesses had misidentified him as the shooter. Had appellate counsel raised the improper exclusion of Howell's confession to Fricks, Mr. Thomas would have prevailed in this appeal. *See Tenney*, 205 Ill. 2d at 441 (convictions reversed and

new trial ordered where the exclusion of an out-of-court confession by another person violated the defendant's due process rights). Mr. Thomas was prejudiced by appellate counsel's deficient performance.

## GROUND 2: MR. THOMAS IS ACTUALLY INNOCENT, AND HIS CONTINUED INCARCERATION VIOLATES HIS FIFTH AND FOURTEENTH AMENDMENT RIGHTS.

This is "the extraordinary case" that the Supreme Court noted in *Schlup v. Delo*, 513 U.S. 298, 324 (1995). ("As we have stated, the fundamental miscarriage of justice exception seeks to balance the societal interests in finality, comity, and conservation of scarce judicial resources with the individual interest in justice that arises in the extraordinary case.") A Constitutional miscarriage of justice – the trial court excluding the testimony of Chaplain Fricks and *all* evidence of Nathaniel Howell's guilt – led to the conviction of Marquis Thomas. And now evidence, unavailable at the time of Mr. Thomas' trial, has come to light to not only exculpate Mr. Thomas, but to clearly identify Nathaniel Howell as the killer. Mr. Thomas was deprived of the ability to present his defense at trial, and new evidence exculpates him just as Fricks' testimony would have. "Due process entitles a defendant to be sentenced on the basis of accurate information." *Williams v. United States*, 74 F.3d 1242 (7th Cir. 1996). Mr. Thomas was convicted on the basis of exculpatory information withheld from the jury, and his continued incarceration violates his due process rights under the Fifth and Fourteenth Amendments.

At this stage, the petitioner has the burden to show "that the new evidence is reliable and that it was not presented at trial." *Gomez v. Jaimet*, 350 F.3d 673, 679 (7th Cir. 2003). Mr. Thomas' actual innocence claim is based primarily on the

testimony of Stedman Dismuke, a newly discovered eyewitness who testified that Howell, not Mr. Thomas, shot Nunn, and the newly discovered account of Marcellus Motton, who testified that Howell admitted he was the shooter just days after the murder. This testimony is supported by the newly available accounts of Howell's brother Cordell Thurman, who also testified that Howell admitted to shooting Nunn, and of Toi McKinney, who testified that, immediately after she heard gunshots on the night of Nunn's murder, Howell ran inside and said, "I did it. I did it."

It should be a stark, red, flashing light to this Court that the only court to hear the testimony of Chaplain Fricks *and* the new witnesses ***granted*** Mr. Thomas a new trial at which the fact-finder could hear all relevant, admissible evidence.

At trial, the State presented no physical evidence connecting Mr. Thomas to Nunn's murder. The State's case was based entirely on problematic eyewitness testimony. Due to the trial court's error in excluding Chaplain Fricks' testimony, the jury that convicted Mr. Thomas never heard *any* testimony about Nathaniel Howell's many confessions, including his confession to Rockford police, his confession to Fricks, his confession to Marcellus Motton, his confession to his brother Cordell Thurman, and his confession to Toi McKinney. The jury never heard from Stedman Dismuke, an eyewitness to the shooting who identified Nathaniel Howell as the shooter.

At Mr. Thomas' trial, the State's case relied on the testimony of three eyewitnesses, all of whom were problematic. One witness recanted her identification of Mr. Thomas as the shooter, and the other two supplied conflicting accounts of the

murder that failed to reliably place Mr. Thomas at the scene. No physical evidence linked Mr. Thomas to the crime, and the State could provide no credible motive for Mr. Thomas to kill Nunn. Had the new evidence identifying Howell as the shooter been available at trial, Mr. Thomas likely would have been acquitted, and if it is presented at a new trial, there is a strong likelihood that he will be found not guilty.

In light of the considerable new evidence that Howell murdered Nunn, along with the evidence already presented at Mr. Thomas' trial, "it is more likely than not that no reasonable juror would have found him guilty beyond a reasonable doubt." *Schlup*, 513 U.S. at 327.

## III.  CONCLUSION

Marquis Thomas was denied his Sixth Amendment right to effective assistance of appellate counsel. Mr. Thomas' court-appointed appellate counsel failed to challenge at least one clearly erroneous pre-trial ruling that precluded Mr. Thomas from introducing evidence that Nathaniel Howell confessed to the crime that Mr. Thomas was convicted of. Mr. Thomas was deprived of the right to present a complete defense by these pre-trial rulings.  Newly discovered evidence not presented at his trial paints an even clearer picture that Nathaniel Howell murdered Lavontaye Nunn and demonstrates that Marquis Thomas is innocent of the crime for which he was convicted. Mr. Thomas' continued incarceration violates his Fifth and Fourteenth Amendment rights, and Marquis Thomas therefore respectfully requests that this Court grant his petition, vacate his conviction and sentence, and order a new trial.

Dated: November 1, 2023                                   Respectfully submitted,

*/s/ Robert Middleton*

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.


Robert Middleton,
J. Maxwell Heckendorn,
ArentFox Schiff LLP
233 S. Wacker Dr., Ste. 7100
Chicago, Illinois 60606
312-258-5500
Robert.Middleton@afslaw.com
Max.Heckendorn@afslaw.com

Gregory Swygert
Bluhm Legal Clinic
Northwestern Prtizker School of Law
375 E. Chicago Ave.
Chicago, Illinois 60611
312-503-5330
Gregory.swygert@law.northwestern.edu

Counsel for Petitioner Marquis Thomas